# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**LESLIE SMITH**,

        Plaintiff,

    vs.                                    No. 08CV105 MCA/LCS

**STATE FARM INSURANCE COMPANIES d/b/a
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,**

        Defendant.

## MEMORANDUM OPINION AND ORDER

      **THIS MATTER** comes before the Court on Defendant's *Motion for Summary Judgment* [Doc. 6], filed February 13, 2008; *Plaintiff's Motion for Declaratory Judgment* [Doc. 26], filed May 16, 2008; and *Defendant's Motion to Strike Plaintiff's Supplemental Evidence in Support of Motion for Declaratory Judgment* [Doc. 41], filed April 27, 2009. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court denies all three motions.        .

## I. BACKGROUND

      The following facts are taken from the complaint or the summary-judgment record and are either uncontroverted or viewed in the light most favorable to Plaintiff Leslie Smith.

      On or about April 20, 2003, Ms. Smith was a passenger in a Jeep being driven by John Riley.  Ms. Smith and Mr. Riley were headed westbound on State Road 404 in Dona Ana

County, New Mexico, when a vehicle operated by Crystal Rhodes ("Crystal") made an unexpected U-turn in front of them. Mr. Riley's Jeep "T-boned" Crystal's vehicle and Ms. Smith was injured as a result.

A *New Mexico State Police* report prepared after the accident lists Martha Rhodes ("Martha") as the owner of the vehicle that Crystal was driving at the time of the collision. Martha and Danny Rhodes are Crystal's parents. The report also shows that, at the time of the accident, the Rhodes vehicle was insured under a policy issued by Farmers Insurance Group. [Doc. 9; Exh. H at 1].

At the time of the accident, Ms. Smith was insured under three policies that her father, Larry Smith, carried with Defendant State Farm Insurance ("State Farm"). Each policy provided uninsured/underinsured motorist coverage (hereinafter "Coverage U") limits of $50,000 per accident, for a total stacked limit of $150,000. [Doc. 7 at 1-2]. With respect to Coverage U, the State Farm policies read:

> SECTION III - UNINSURED AND UNKNOWN MOTORIST - COVERAGE U
>
> When Coverage U Does Not Apply
>
> THERE IS NO COVERAGE:
>
> 1.   FOR ANY INSURED WHO, WITHOUT OUR WRITTEN CONSENT, SETTLES WITH ANY PERSON OR ORGANIZATION WHO MAY BE LIABLE FOR THE BODILY INJURY OR PROPERTY DAMAGE. . . ."

[Doc. 7; Exh. G].

2

On September 23, 2005, Ms. Smith signed a document captioned *Release in Full of all Claims and Rights* ("the Release"), providing, in pertinent part, as follows:

> For and in consideration of the sum of TWENTY-FIVE THOUSAND DOLLARS & ZERO CENTS ($25,000.00) receipt of which is acknowledged, I release and forever discharge Danny Rhodes, Crystal Rhodes and the insurer, their principals, agents, and representatives from any and all rights, claims, demands and damages of any kind, known or unknown, existing or arising in the future, resulting from or related to personal injuries, death or property damage, arising from an accident that occurred on or about the 20th day of April, 2003 at or near Dona Ana, New Mexico.

[Doc. 7; Exh. F].

In a letter dated December 16, 2005 and addressed to "Sir/Madam" at State Farm's Tempe, Arizona office, counsel for Ms. Smith "serve[d] notice that [Ms. Smith would] pursue a claim under the Medical Pay and Underinsured Motorist provisions of her household policies." [Doc. 7; Exh. B, Dec. 16, 2005 letter from Robert L. Lovett at 2]. Counsel also explained that Ms. Smith's case "was originally handled with the tort feasors [sic] carrier, Farmers Ins Group[,]" but because an assets check revealed no assets, counsel and Ms. Smith had "moved ahead to settle the case." [Id.; Exh. B, Lovett letter at 1]. Counsel did not attach a copy of the Release to this letter.

On February 8, 2006, counsel's Case Manager, Albert Munoz, forwarded to Mike Woodruff of State Farm's Tempe office, a memorandum prepared by Jim Laws following Mr. Laws' asset check on the Rhodes family. [Doc. 7; Exh. D, Memorandum from Jim Laws to Rob Lovett]. Mr. Laws' check revealed no real property assets in the name of Crystal or

her husband. [Id.].  With respect to Martha and Danny Rhodes, Mr. Laws discovered that:

(1)     Martha and Danny Rhodes owned a piece of property in Chaparral, New Mexico, which was assessed at $111,307 with a mortgage in the principal amount of $96,815;

(2)     Martha and Danny Rhodes owned a second piece of property in Chaparral, which was assessed at $43,501 with a mortgage in the principal amount of $58,547;

(3)     Danny Rhodes' income for 2004 was approximately $77,000 and for 2003 was approximately $70,000; and

(4)     a records search revealed no earnings for Martha Rhodes for the two years prior to the asset check.

[Id.].

On March 22, 2006, Mr. Munoz forwarded to Mr. Woodruff a copy of the Release. By letter dated July 11, 2006, Jake Bourguet, a Team Manager in State Farm's Albuquerque office, wrote to counsel for Ms. Smith, explaining that State Farm was unable to extend Coverage U benefits to Ms. Smith because she had violated the terms of her policy by settling her claim without State Farm's consent. [See Doc. 7; Exh. G, July 11, 2006 letter from Jake Bourguet to Robert Lovett].

On December 14, 2007, Ms. Smith filed her state-court *Complaint for Damages and Personal Injury*, which State Farm timely removed to this Court. [See Doc. 1].  State Farm thereafter moved for summary judgment on the ground that Ms. Smith breached the

4

Coverage U provision of her policy by settling with Crystal and Danny Rhodes without State Farm's written consent, thereby destroying its subrogation rights. [See generally Docs. 6 and 7]. Among other things, State Farm contends that, if it were unable to collect upon a judgment against Crystal, it would have pursued a claim against her father, Danny, under the family purpose doctrine. [Id. at 7]. In response, Ms. Smith does not dispute that she settled her claim and released Danny and Crystal without first obtaining State Farm's consent; however, she maintains that State Farm has not demonstrated a resulting substantial prejudicial, such that it is now relieved from paying underinsured motorist/Coverage U benefits. [Doc. 9 at 2-4]. At the same time she filed her summary-judgment response, Ms. Smith also filed *Plaintiff's Motion for Continuance*, seeking more time to take depositions of the Rhodes family regarding their assets, and also to determine the applicability of the family purpose doctrine to the case. [See generally Doc. 10]. Ms. Smith subsequently filed a motion for declaratory judgment, seeking a declaration that, notwithstanding her breach, State Farm is obligated to provide her with Coverage U benefits. [See generally Doc. 26].

By *Memorandum Opinion and Order* entered September 24, 2008, this Court granted Ms. Smith's motion for continuance and deferred a ruling on her summary-judgment and declaratory-judgment motions. [See Doc. 31 at 1, 17-18]. On March 17, 2009, Ms. Smith filed *Plaintiff's Supplemental Evidence in Response to Supplement to Motion for Summary Judgment of Defendant State Farm* [Doc. 37], in which she asserts that additional discovery has revealed that (1) the family purpose doctrine is inapplicable under the circumstances; and (2) State Farm would have no realistic possibility of collecting upon a judgment entered

5

against either Crystal or Danny Rhodes. [See generally Doc. 37].

## II. ANALYSIS

### A. Standard of Review: Fed.R.Civ.P. 56

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed.R.Civ.P. 56(e). Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Id. Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). See Celotex, 477 U.S. at 324. It is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and

draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### B. State Farm's *Motion for Summary Judgment* [Doc. 6] and *Plaintiff's Motion for Declaratory Judgment* [Doc. 26]

State Farm's motion for summary judgment is grounded upon its contention that "[t]he undisputed facts establish that [Ms. Smith] is precluded from recovering underinsured motorist benefits because she breached the consent to settle provisions of her insurance policies by settling with the tortfeasor and her father without obtaining the written consent of State Farm." [Doc. 6 at 1].

The purpose of underinsured motorist benefits is "to protect the insured against financially irresponsible motorists. . . ." State Farm Mut. Auto Ins. Co. v. Fennema, 110 P.3d 491, 495 (N.M. 2005).  By the same token, an insurer who pays such benefits is entitled to attempt to hold a financially irresponsible motorist accountable for his injury-causing conduct by pursuing and enforcing its subrogation rights.  Id.  A consent-to-settle provision, such as the one Ms. Smith is admits to having breached here, lets the insurer determine how best to protect its subrogation rights by allowing it to

> investigat[e] the merits of the liability case against the tortfeasor, the extent of damages suffered by its insured, the estimated expense of litigating against the tortfeasor and whether the tortfeasor has sufficient assets to give the insurer a realistic possibility of collecting a judgment against the tortfeasor. If the insurer elects to withhold consent to settle, it may tender the amount of the tortfeasor's liability coverage that was offered to its insured. This allows the insurer to preserve its subrogated interest while placing its insured in the same position he or she would have been in, had the insured been authorized

7

to settle with the tortfeasor.

Id. at 494 (internal citation omitted).

For more than 40 years, it has been "well established that if an insured, without the knowledge of his insurer, effectively releases a wrongdoer from liability for a loss before payment of the loss has been made by the insurance company, he destroys any right of subrogation the insurer may have against the wrongdoer. . . ." Armijo v. Foundation Reserve Ins. Co., 408 P.2d 750, 752 (N.M. 1965). The New Mexico Supreme Court subsequently and specifically applied this principle to claims involving underinsured motorist benefits. See March v. Mountain States Mut. Cas. Co., 687 P.2d 1040, 1044 (1984) (upholding consent-to-settle provision in underinsured motorist policy, concluding that insured's breach of provision precluded insured from collecting benefits).

Still, because it would frustrate the purpose of underinsured motorist benefits to deny coverage when the insured's breach of a consent-to-settle provision "has no *real* effect on the insurer's ability to recover from an insolvent tortfeasor through subrogation[,]" New Mexico courts require the insurer to demonstrate that it has been substantially prejudiced by the breach before it will be relieved of its contractual obligations. Fennema, 110 P.3d at 493 (emphasis added). Although a presumption of substantial prejudice arises upon proof of the insured's breach of a consent-to-settle provision, this presumption is a rebuttable one. Id. at 493, 495.

Fennema involved facts similar to those of the instant case, inasmuch as Russell Fennema, a State Farm insured, breached the consent-to-settle provision of his policy when,

8

without State Farm's written consent, he settled his claim with—and released from further liability—the negligent driver who struck the rear of Fennema's vehicle. <u>Fennema</u>, 110 P.3d at 492-493.  Fennema's attempt to rebut the presumption of substantial prejudice, however, fell short where the evidence he presented showed only that the tortfeasor was a graduate student in the University of New Mexico Department of Psychology. <u>Id.</u> at 495.  Reminding that judgments in New Mexico are valid and enforceable for 14 years, the New Mexico Supreme Court affirmed entry of summary judgment for State Farm, explaining that Fennema's evidence, without more, "[did] not as a matter of law, meet or rebut the presumption of substantial prejudice [because] State Farm [might] have had a realistic possibility of recovering from the tortfeasor, who, as a graduate student in psychology, was likely to be gainfully employed in the near future." <u>Id.</u>

In this case, Ms. Smith and State Farm both cite and rely on <u>Fennema</u> for competing propositions—(1) that Ms. Smith has rebutted the presumption of substantial prejudice by demonstrating through Mr. Laws' asset check on the Rhodes family that Crystal has no assets subject to subrogation (Ms. Smith's position), and (2) that Ms. Smith has failed to rebut State Farm's showing that it has been substantially prejudiced as a result of Ms. Smith's having released asset-holder Danny, whom State Farm was prepared to pursue under the family purpose doctrine (State Farm's position). [<u>See</u> Doc. 7 at 7; Doc. 8 at 2-3].

"[T]he family purpose doctrine imposes liability on the head of a household for the negligent operation of a vehicle by a member of the household to whom the head of household has furnished the vehicle." <u>Hermosillo v. Leadingham</u>, 13 P.3d 79, 84 (N.M.App.

2000).  The doctrine, originally a creature of agency law, today is recognized as existing to

promote the public policy of "requir[ing] a responsible person to answer for damages caused

by the family car."  Madrid v. Shryock, 745 P.2d 375, 377 (N.M. 1987) (explaining that this

policy statement reflects "a more accurate justification of family purpose decisions [than] the

[agency-based] legal fiction that the automobile owner makes the pleasure and convenience

of his family his business when he provides a vehicle for the use of his family.").

    The elements of the family purpose doctrine are set forth in the following New

Mexico Uniform Jury Instruction:

> If you find that the motor vehicle operated by _____
> (driver) [was made available by _____ (head of
> household) to _____ (driver) for any purpose on this
> occasion] [or] [was furnished by _____ (head of
> household) to family members of the household, including
> _____ (driver), for general use] [and that _____
> (driver) was a family member of _____ (head of
> household) household], then _____ (head of household)
> is liable for damages proximately caused by negligent operation
> of the vehicle by _____ (driver).

N.M. STAT. ANN. UJI 13-1210 (2007) ("the UJI").  Citing this UJI, Team Manager Jake

Bourguet stated in his affidavit that

> [a]s the father of Crystal Rhodes, Danny Rhodes would have
> been liable on a subrogation claim for underinsured benefits to
> State Farm under the Family Purpose Doctrine [and that b]ased
> on the information in the assets check, State Farm had a realistic
> potential to collect on a judgment in a subrogation action against
> Danny Rhodes for any amounts State Farm would potentially
> have paid on an underinsured motorist claim.

[Doc. 7; Exh. A, Affidavit of Jake Bourguet at 3].

Because State Farm's argument *presumed* the applicability of the family purpose doctrine when there was no record evidence tending to show that the doctrine would or would not apply, the Court granted Ms. Smith's motion for continuance to allow her to depose the Rhodes family. [See Doc. 31 at 17]. Crystal, Danny, and Martha Rhodes all now have been deposed, but the Court still is unable to determine as a matter of law whether the family purpose doctrine applies; for that reason, and as explained more fully below, the Court will deny the declaratory-judgment and summary judgment motions at this time.

Once again, "the family purpose doctrine imposes liability on the head of a household for the negligent operation of a vehicle by a member of the household to whom the head of household has furnished the vehicle." Hermosillo, 13 P.3d at 84. The policy supporting the doctrine is that a financially responsible person should answer for damages caused by a user of the family car. Madrid, 745 P.2d at 377. As an initial matter, the Court notes that the doctrine does not apply in cases where the driver carries her own insurance, which Ms. Smith maintains is the situation here. See Ramirez v. Ramirez, 929 P.2d 982, 984 (N.M.App. 1996). According to Ms. Smith, "Crystal Rhodes had her own liability coverage." [Doc. 37 at 7-8]. But this is not supported by the evidence, which reveals that (1) Crystal merely "pa[id] for [w]hatever insurance *they* [Danny and Martha] had" on a car that has been described as Crystal's "beginner vehicle[,]" [see Doc. 37; Exh. A, depo. of C. Rhodes at 27 (emphasis added)]; and (2) the named insured on the policy from which Ms. Smith received the $25,000 payment is Danny—not Crystal—Rhodes. [See Doc. 28; Exh. J].

11

Moving on to the elements of the family purpose doctrine, it is clear that Danny Rhodes serves as the "head of the household," a term the New Mexico Court of Appeals has defined as the individual who supports the family, in whole or in part, because of "a natural or moral obligation to render such support," and upon whom the family depends for that support.  See State Farm Mut. Auto. Ins. Co. v. Duran, 601 P.2d 722, 725 (N.M.App. 1979). Both Danny and Martha testified that Martha does not work outside the home and that Danny, who works for a tool and die manufacturer, provides the family's income. [Doc. 37; Exh. B, depo. of M. Rhodes at 13 (describing Danny Rhodes as "the breadwinner"); Exh. C, depo. of D. Rhodes at 31, 45 (describing himself as "primarily responsible" for family's income)].  Martha testified that she was not employed in April 2003 (the time of Crystal's automobile collision), and that the last time she was employed outside the home "would have been when Crystal was around 16." [Id.; Exh. B, depo. of M. Rhodes at 13].  Similarly, Danny testified that in the seven years preceding his 2009 deposition, he did not believe that Martha had worked outside the home. [Id.; Exh. C, depo. of d. Rhodes at 12].

Notwithstanding Danny's role as head of the household, however, it is unclear whether, for purposes of the family purpose doctrine, Danny "furnished" the vehicle to Crystal, or if he even had authority to do so.  This is important because "[a]n indispensable requisite of the family purpose doctrine is that the person sought to be held liable own, maintain, or furnish the automobile, and have or exercise some degree of control over its use."  61 C.J.S. *Motor Vehicles* § 844.

In this case, it is undisputed that the vehicle in question was owned by and titled in the name of Martha Rhodes. [Doc. 37; Exh. B, depo. of M. Rhodes at 26-27; Exh. A, depo. of C. Rhodes at 13].  Moreover, each time Crystal sought to use the car, she would ask her mother's permission. She did not ask her father's permission.  [Id.; Exh. A, depo. of C, Rhodes at 18].  Authority from jurisdictions other than New Mexico demonstrates that the family purpose doctrine has been held both applicable and inapplicable in situations where the vehicle in question was owned by someone other than the head of the household.  For example, in Campbell v. Paschal, a 15-year-old motorist was involved in an accident while driving a car that was owned by her brother.  Before the accident, the brother, who was in the Navy and stationed overseas, had left his car at the home of their father, to whom he also granted authority to regulate the vehicle's use.  The father, who was also the head of the household, "agreed to keep the car in good running condition" and occasionally drove it to run errands.  Campbell v. Paschal, 347 S.E.2d 892, 897 (S.C.App. 1986).

Notwithstanding that father/head of household did not own the vehicle involved in the accident, the South Carolina Court of Appeals concluded that the family purpose doctrine applied to him because (1) he controlled the use of the vehicle; (2) he furnished the car to his 15-year-old daughter; and (3) the car was being used to serve a general family purpose at the time of the accident.  Campbell, 347 S.E.2d at 897.

By contrast, in McNamara v. Prather, where 21-year-old son was involved in a collision while driving a car that had been purchased by and registered to his mother, the Kentucky Court of Appeals held that the trial court erred in denying father's directed-verdict

motion, which was premised "on the theory that there was no evidence tending to show that he owned or maintained the automobile driven by [the son] as a family purpose car, or that [the son] was operating the car with his permission." McNamara v. Prather, 127 S.W.2d 160, 161 (Ky.App. 1939). Noting that there was no proof that the father had either assumed the cost of maintaining the car or ever exercised control over it, the court emphasized that it had "never held that the father is liable merely because he is the head of the family, but the one who owns, maintains, or provides the car for family use is liable for its negligent operation." Id.

In this case, even with the benefit of additional briefing, there simply is still not enough information in the record for the Court to be able to determine, as a matter of law, that the family purpose doctrine does or does not apply. On the one hand, it is undisputed that the vehicle that Crystal was driving at the time of the collision is owned by and titled in the name of her mother, Martha. Additionally, Crystal would ask Martha, not Danny, for permission each time she wanted to use the car, and did so on the occasion in question. These undisputed facts would seem to support a finding that the doctrine does not apply to Danny Rhodes in this case.

On the other hand, it is not at all clear whether Danny, even though he did not own the car, nevertheless "ha[d] or exercise[d] some degree of control over its use." 61 C.J.S. Motor Vehicles § 844. As the "breadwinner" who was "primarily responsible" for the family' income, it seems logical that Danny would have paid the Rhodes' family's car-related expenses. But "authority and control of the vehicle . . . is not necessarily determined

14

by . . . . payment for the expenses of operation."  <u>Calhoun v. Eaves</u>, 152 S.E.2d 805, 808

(Ga.App. 1966) (*citing* <u>Baker v. Shockey</u>, 92 S.E.2d 314, 316 (Ga.App. 1956) (family

purpose doctrine did not apply where husband paid for gas and oil for car that wife bought

"with her own funds without the advice, counsel, or consent of her husband" but where he

otherwise had no authority or control over its use and operation).  In addition to the fact that

it is unclear whether Danny or Martha (or neither or both) actually purchased the vehicle

involved in Crystal's accident, this case is slightly complicated by the fact that it was "a

logistic[al] decision" to title the Rhodes' vehicles (including, apparently, Danny's truck) in

Martha's name.  Indeed, through her deposition, Martha testified that the reason "[a]ll of the

vehicles are in [her] name" is that Danny "doesn't want to insure them, he doesn't want to

go to the motor vehicle department. . . ." [Doc. 37; Exh. B, depo. of M. Rhodes at 33].  As

Martha explained, the decision to title the family's vehicles in her name was made

> when [Danny] discovered that he had to go to the motor vehicle
> department to register his truck, because they wouldn't let me do
> it on account of the state law changed about who could do it,
> and he got mad because he had to take off work.  So after that,
> he signed everything over to my name.

[<u>Id.</u>; Exh. B, M. Rhodes depo. at 33].  Finally, while Crystal testified that she routinely asked

her mother for permission to drive the car in question, she also testified that she *could have*

asked her father.   [<u>Id.</u>; Exh. A, depo. of C. Rhodes at 18 ("Q: Could you have asked your

father to use it if you wanted to? A: I could but he was never home.")].   Again, for these

reasons, the Court cannot say at this point as a matter of law that the family purpose doctrine

does or does not apply under the circumstances.  Accordingly, State Farm's summary-

judgment motion must be denied.

The Court repeats what it said in its September 28, 2008 *Memorandum Opinion and Order* deferring ruling on the summary-judgment and declaratory-judgment motions:

> Whether the family purpose doctrine even applies in this case may be dispositive of whether Ms. Smith's alleged breach of the Coverage U provision resulted in substantial prejudice to Defendant. On the one hand, if the family purpose doctrine applies but Crystal Rhodes is deemed asset-free and judgment-proof, Ms. Smith's actions may have destroyed Defendant's chance to bring a subrogation action against asset-holder Danny Rhodes for any Coverage U benefits Defendant might have paid. On the other hand, if the family purpose doctrine does *not* apply and Crystal Rhodes is deemed asset-free and judgment-proof, it is difficult to see how Defendant would be able to claim substantial prejudice from fulfilling its contractual obligation to Ms. Smith, notwithstanding that it would not later be able to subrogate. After all, "it would be inconsistent with the purpose of the underinsured motorist statute to deny an insured indemnification when the insured's breach of a consent-to-settle provision has no real effect on the insurer's ability to recover from an insolvent tortfeasor through subrogation." Fennema, 110 P.3d at 494 (*citing* Sorensen v. Farmers Ins. Exch., 927 P.2d 1002, 1005 (Mont. 1996) (explaining that "[t]he purpose of underinsured motorist insurance is to provide a source of indemnification for accident victims when the tortfeasor does not provide adequate indemnification" and noting that "[d]enying accident victims indemnification based upon their action which can have no effect on the insurer's ability to subrogate will not further the purpose of underinsured motorist coverage.")).

[Doc. 31 at 12-13].

Thus, without knowing whether the family purpose doctrine applies, the Court cannot determine whether Ms. Smith's admitted breach of the consent-to-settle provision substantially prejudiced State Farm. In any event, "[t]he ultimate issue of substantial

prejudice is, in most cases, a question for a jury."  Fennema, 110 P.3d at 493.  For these reasons, the Court will deny the motion for declaratory judgment.

### C. *Defendant's Motion to Strike Plaintiff's Supplemental Evidence in Support of Motion for Declaratory Judgment* [Doc. 41]

On February 25, 2009, Ms. Smith filed *Plaintiff's Motion for Leave to File Additional Evidence* [Doc. 34], in which she (1) explained that the depositions of the Rhodes family had been taken; and (2) sought leave to file excerpts therefrom "in support of *Plaintiff's Motion for Declaratory Judgment*. . . ." [Doc. 34 at 1].  When nearly three weeks passed without a response from State Farm, the Court granted Ms. Smith's motion in a text-only entry on the docket. [See Doc. 36; see also D.N.M.LR-Civ. 7.4(a) ("A response must be served and filed within fourteen (14) calendar days after service of the motion.").  On April 20, 2009, Ms. Smith filed her supplemental evidence in support of her declaratory-judgment motion. [Doc. 40].

Thereafter, on April 27, 2009, State Farm filed *Defendant's Motion to Strike Plaintiff's Supplemental Evidence in Support of Motion for Declaratory Judgment* on grounds including that Ms. Smith "did not seek, or obtain, the proper leave from this Court permitting h[er] to submit additional briefing on these matters . . . ." [Doc. 41 at 1].  This is inaccurate, as the Court, on March 16, 2009, granted Ms. Smith's motion to file supplemental evidence in support of her declaratory-judgment motion. [See Doc. 36].  Because Ms. Smith made her request to supplement in a properly filed document, the Court declines to strike it. State Farm's motion will be denied.

**III. CONCLUSION**

For the reasons set forth more fully above, the Court denies  Defendant's *Motion for Summary Judgment* [Doc. 6]; *Plaintiff's Motion for Declaratory Judgment* [Doc. 26]; and *Defendant's Motion to Strike Plaintiff's Supplemental Evidence in Support of Motion for Declaratory Judgment* [Doc. 41].

**IT IS, THEREFORE, ORDERED** that Defendant's *Motion for Summary Judgment* [Doc. 6] is **DENIED**;

**IT IS FURTHER ORDERED** that *Plaintiff's Motion for Declaratory Judgment* [Doc. 26] is **DENIED**;

**IT IS FURTHER ORDERED** that and *Defendant's Motion to Strike Plaintiff's Supplemental Evidence in Support of Motion for Declaratory Judgment* [Doc. 41] is **DENIED**.

**SO ORDERED** this 27th day of July, 2009, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge

18